[Civ. No. 4692.   Fourth Dist.   May 19, 1954.]

NINA FRANCES McINTIRE et al., Appellants, v. G. A. WASSON et al., Respondents.

Siemon & Siemon for Appellants.

J. O. Reavis for Respondents.

BARNARD, P. J.—This is an action to quiet title to a 30-foot strip of land in Lot 7 of a certain subdivision.   The defendants and the plaintiffs own adjoining properties in said Lot 7, and the dispute is as to the boundary line between them.   The plaintiffs are the successors in interest of their mother, Mrs. Kerwin.

On April 3, 1912, a corporation filed a map showing the subdivision of a section into 64 numbered lots of approximately 10 acres each.   It also shows several strips reserved for road purposes, and marked as lettered lots.   Along the north side of the north tier of lots appears such a strip 1 mile long and 30 feet wide, which is marked "Reserved for road Lot E."   It is admitted that this strip is the south

half of a county road, and that the north line of this strip corresponds with the section line. Lot 7 is the second lot from the west in the north tier of lots. There is also a strip reserved for a road on the east side of Lot 7, the width of which is not given. Lot 7 is marked as containing 10.09 acres. Its east and west dimensions are given as 661.85 feet at the north, and 661.44 feet at the south. Its north and south dimensions are given as 664.22 feet at the west, and 664.38 feet on its east line. The map contains the statement "All stakes 4" x 4" R.W. All lots are measured to center of stakes. All dimensions are from section lines to center of roads." It also contains the statement "All lots intended for sale are designated by number and all pieces or parcels of land designated hereon as roads are excepted and reserved from sale and are intended for use as private roads until such time when the corporation may dedicate the same to public use."

The common grantor of the parties to this action was Frank E. Green, who acquired title from the corporation by two deeds. The first, dated May 1, 1928, conveyed the south 126 feet of the north 282 feet of Lot 7, and the second, dated April 5, 1930, conveyed all of Lot 7 except the south 126 feet of the north 282 feet. Apparently, Green had had a prior contract for the purchase of Lot 7 since he had contracted to sell a portion of that lot to Mrs. Kerwin before he received the first of these deeds.

On February 23, 1928, Green contracted to sell to Mrs. Kerwin "the South One Hundred Thirty and Thirty-eight hundreds (130 38/100) feet of Lot Seven (7)" of this subdivision for $1,100, payable $400 down and the balance in installments. Thereafter, Green gave five deeds conveying portions of said Lot 7, four of them with a frontage of 126 feet on the street to the east of the property and the other conveying the rest of Lot 7 to Mrs. Kerwin. These deeds were as follows:

(1) On May 2, 1928, a deed to Holland conveying the South 126 feet of the North 282 feet.

(2) On May 5, 1930, one to Mrs. Kerwin (plaintiffs) conveying all of Lot 7 except the north 534 feet.

(3) On November 10, 1930, one to the Wassons (defendants) conveying the South 126 feet of the North 534 feet.

(4) On October 23, 1931, one to Marks conveying the South 126 feet of the North 156 feet.

(5) On April 14, 1932, one to Welch, conveying the South 126 feet of the North 408 feet.

The first grantee to enter and occupy his property was Holland, who occupied the second 126 feet south of what may be called the property line, and allowing for the 30-foot strip at the north which was reserved for road purposes. The next was Mrs. Kerwin, predecessor of the plaintiffs, who in 1928 took possession of the south 130.28 feet, including the 30-foot strip in controversy. She built a house, planted a palm tree on the 30-foot strip, used a part of that strip for a driveway, and maintained an oil tank thereon. There is no dispute that she has occupied the strip in question at all times since 1928, and without objection from the Wassons until shortly before this suit was filed. Wasson entered at the time he bought his property and built a house on it, occupying the 126 feet north of the 130.28 feet occupied by Mrs. Kerwin. In 1931, he built a fence on what he "presumed" was the boundary line between his property and Mrs. Kerwin's, having been shown her contract with Green, and ten years later built a more substantial fence along the same line. He testified that he never claimed more than 126 feet prior to 1951, that he now claimed 156 feet, and that he first claimed 156 feet when the tax collector "sold the North Thirty feet of Lot Seven and that was the time I discovered I was Thirty feet too far north." Welch occupied the 126 feet between Holland and Wasson, and Marks occupied the north 126-foot parcel running to what may be called the property line, but not including the 30 feet at the north reserved for road purposes. Marks testified that he had a contract first and later Green gave him a deed; that he wanted to know where the boundaries were in order to locate his house; that he asked Green about this and that Green "told me to measure from the center of the street One Hundred and Fifty-six feet back south"; that Holland helped him to measure it; and that he measured his lot 126 feet from the edge of the road to Holland's lot on the south. One of the plaintiffs testified that she was present, with her mother, in February, 1928, when Green showed them the stakes and pointed out their frontage of 130 feet where they were building a house. No stakes were to be found at the time of the trial.

In 1950, it was discovered that "the north 30 feet of Lot 7" had been assessed for 1930 to Green, and sold to the state for nonpayment of taxes in 1931. In order to straighten out their titles the four then owners of the 126-foot parcels paid the amount necessary to clear up that tax sale, and on March 13, 1951, that 30 feet was deeded by the tax collector to one

Tenosa who had purchased Marks' property, the north one of these 126-foot parcels. As a part of this transaction each of the three northerly owners of 126-foot parcels agreed to, and did, deed the south 30 feet of his property to his neighbor on the south. The Wassons were given such a deed by their neighbor on the north. This is only a paper transaction, to straighten out the titles, and it left each of the four owners of 126-foot parcels in possession of the same property he had occupied for years. The plaintiffs, as successors of Mrs. Kerwin, did not participate in this transaction since her deed called for all of the rest of Lot 7 and her original contract called for the south 130.28 feet.

The Wassons then had their property surveyed by a surveyor who took a line 30 feet south of the section line as the northerly line of Lot 7, and thus fixed Wasson's south line at a point 534 feet south of the south line of the county road, leaving only 100.38 feet for the plaintiffs. The Wassons having accepted the deed to 30 feet from their neighbor on the north, then claimed to own an additional 126 feet south of that, based on this new survey, and began the erection of another house which extended about halfway over the disputed 30-foot strip.

The plaintiffs brought this action for an injunction and to quiet their title to that 30-foot strip. The defendants answered and cross-complained, seeking to quiet their title to the disputed strip. The court found that Lot 7 extends south 664.38 feet from the south line of Lot E on said map, which was set apart for road purposes; that the northerly line of Lot 7 was the southerly line of Lot E; "that it was not the intent of any prior grantor of any portion of Lot 7 . . . to grant or convey any portion of said lot north of a point 30 feet south of the center of the road marking the actual Kern-Tulare County line"; that the defendants are entitled to the south 126 feet of the north 534 feet of Lot 7; and that the plaintiffs are entitled to all of Lot 7 except the north 534 feet. As conclusions of law, it was found that the defendants have valid title to the south 126 feet of the north 534 feet of Lot 7, measured from the edge of the county road, and that the plaintiffs "have title only to property within the most southerly 100 feet of said Lot 7." Judgment was entered accordingly and the plaintiffs have appealed.

The first of these findings is obviously erroneous as shown by all of the evidence, including the testimony of defendants' surveyors, and is inconsistent with the conclusion that the

plaintiffs own only the most southerly 100 feet of Lot 7. If Lot 7 did extend 664.38 feet south of the south line of this county road the appellants would have their 130.38 feet and there would be no controversy. The controlling question on this appeal is with respect to the intention of the common grantor, Green, with respect to the descriptions set forth in the deeds given by him; whether he intended that the distances set forth in the various deeds should be measured from the section line appearing on the map as the north side of Lot E, or from the south side of Lot E, being the ordinary property line at the south edge of the portion reserved for road purposes.

The court's further finding "that no grantee of any portion of said Lot Seven . . . was granted any portion of said Lot E" may be assumed to be correct for the purposes of this opinion. Assuming that Green was not granted any portion of Lot E, it is also true that he did not attempt to grant any portion of Lot E to any of his grantees. It does not follow that he did not, in granting other portions of Lot 7, intend to describe such portions by starting at the section line and allowing for the first 30 feet which had been reserved for road purposes. He made such an allowance in each of the five deeds, which strongly indicates an intention to follow the measurement given for the east and west sides of Lot 7 by taking the section line as a starting point. He purported to deed four parcels, each with a frontage of 126 feet, and one with a frontage of 130.38 feet, these amounting to 634.38 feet, which is the usable portion of Lot 7 as shown on the map. In each of the four cases, while he deeded 126 feet, he also allowed for an additional 30 feet which could only refer to the road reservation at the top of Lot 7. The five parcels conveyed, plus the 30 feet thus allowed for, equals the 664.38 feet shown on the map as the north-south dimension of Lot 7. Before any of these deeds were made Green had contracted to sell Mrs. Kerwin the south 130.38 feet of Lot 7. When he deeded the property to her two years later, presumably in accordance with his contract, he deeded her all of Lot 7 except the north 534 feet, thus indicating an intention to take the given measurement of 664.38 feet as running to the section line. This is confirmed by the other deeds he gave about the same time. It is unbelievable that he intended to deed Mrs. Kerwin the 130.38 feet which he had agreed to sell her but intended this to be 100.38 feet at the south of Lot 7, and the remaining 30 feet at the north end, which would be the natural result if respondents' theory were to

prevail. It also seems unlikely that he would allow taxes for 1930, on the north 30 feet alone, to go delinquent if he had considered that he still owned that property. It is inconceivable that he intended to sell these five parcels, specifying a total of 634.38 feet, without intending to sell the 30 feet immediately south of the road.

The deeds and the map, construed together, clearly disclose that Green intended to follow the distances and directions given on the subdivision map, by using the section line as a starting point. Such evidence as there is, with respect to intention, is entirely to this effect. The grantees in all of the deeds interpreted the descriptions therein in that manner and occupied their properties accordingly for more than 20 years. The evidence of intention thus appearing is largely confirmed by the testimony of two surveyors who testified for the respondents. One of them testified that the map showed the distances on the four sides of Lot 7, and showed that the lot had an area of 10.09 acres; that "the part of Lot E between the east and west portions of Lot 7" would have to be included to give that acreage; that "To get 10.09 acres you have to go north to the section line"; that to get 664.38 feet you have to go from the south boundary of Lot 7 to the section line; that the statement on the map, "All dimensions are from center section lines to the center of the road," indicates that the map maker "was trying to say that all dimensions, where there is a road or a section line bordering the north, that the dimensions do run out to the center of the road or to the section line"; that when the maker of the map put these measurements on the map he measured to the center of the road at the north; that "There are many maps about this vintage where that was the customary practice. We find many maps in Kern County when they gave the dimensions, they showed it out to the center of the road"; and that he believed that was what the map maker was attempting to do. The other surveyor testified that "the dimensions show the entire lot with 664.22 feet on the west side." If that is true, the "entire lot" comes to the section line.

In spite of his testimony of what was customarily done by map makers in 1912 the first of these surveyors used different figures in locating these properties on another map which he prepared for the respondents in January, 1953. He testified that this new map was drawn on the "basis of construction," that the north line of Lot 7 is the line lying 30 feet south

of the section line. When asked to "orient" himself by reading the description in the Kerwin deed and tracing that description on his new map he said: "It is my interpretation that the owner of the subdivision intended that Lot 'E' and Lot 7 be separate parcels, and therefore the north line of Lot 7 must be the line that divides Lot 'E' and Lot 7," and that the 534 feet mentioned in the Kerwin deed should be measured south from a point 30 feet south of the section line. It clearly appears that this witness was giving his interpretation of the original owner's intention in 1912 and not of Green's intention when these deeds were given, or even of the grantor's intention when Green acquired the property. This was the witness' opinion in the light of the way things were being done in 1953, and the reasons he gave for that opinion are not convincing. He fixed the north boundary of Lot 7 at a point 30 feet south of the section line, relying on the fact that the subdivision map showed the parcels reserved for road use as lettered lots, and stated that they were not to be sold. He ignored the statement that all dimensions given are from section lines, the custom of map makers in 1912, the area of Lot 7 as given on the map, and the fact that the actual measurements given on the map do not and could not coincide with the opinion he expressed.

Unless a contrary intention clearly appears, the half of a street upon which a lot abuts is usually considered a part of the lot (*Anderson* v. *Citizens Sav. etc. Co.,* 185 Cal. 386 [197 P. 113].) A contrary intent does not clearly appear here, and the evidence does not bring this case within the recognized exceptions. (*Pierson* v. *Bradfield,* 43 Cal.App.2d 519 [111 P.2d 460].)

There is strong evidence that the distances specified in these deeds were intended to be measured from the section line and not from a point 30 feet to the south of that line. There is no substantial evidence to the contrary, with respect to the intention of the grantors when these deeds were executed. The testimony of the surveyors involves an arbitrary selection of a north line of Lot 7 which, as shown by their own testimony, was not justified by the subdivision map as a whole and which necessarily involved taking a different north to south dimension of Lot 7 from that given in the map. One of the court's findings is admittedly erroneous, and the other essential findings are not supported by the evidence. The measurements and area of Lot 7 and the other data, as given on the map, with the distances specified in the deeds, are controlling.

The fact that certain narrow strips reserved for roads were called lots, and were not to be sold as such, is no indication that their width was not to be considered as a part of the stated measurements of the lots which were to be and which were sold, and is not sufficient to overcome the effect of the other evidence with respect to the intention of the grantor in executing the deeds here in question.

The judgment is reversed.

Griffin, J., and Mussell, J., concurred.